# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| DANIELLE SWANSON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | |
| | ) | Civil Action No.:_____ |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF | ) | JURY TRIAL DEMANDED |
| GEORGIA AND GEORGIA | ) | |
| HIGHLANDS COLLEGE, | ) | |
| | | |
| DEFENDANTS. | | |

## PLAINTIFF DANIELLE SWANSON'S COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

## INTRODUCTION

1.     Beginning in January 2025 and continuing to this day, Defendants

Georgia Highlands College and the Board of Regents of the University System of

Georgia (collectively, "GHC" or "Defendants") have engaged in an ongoing and

devastating retaliation campaign against Plaintiff Danielle Swanson, an Assistant

Professor at GHC and former Chair in the School of Humanities, all because Ms.

Swanson reported to a colleague – in confidence – that Dean Jessica Lindberg

drunkenly encouraged her to have sex with Mike Hobbs, President of GHC, for the

benefit of the School of Humanities.

1

2.      Rather than taking this concern seriously, which is all Ms. Swanson had ever hoped would happen, GHC, through Dean Lindberg and others, has engaged in a coordinated retaliation campaign.

3.      To start, after Ms. Swanson confided in a colleague that Dean Lindberg encouraged her to have sex with President Hobbs to help the School of Humanities, Dean Lindberg herself stripped Ms. Swanson of her role as Chair of the Humanities Department and cut her salary by one third.

4.      Worse still, after Ms. Swanson filed a Charge of Discrimination with the Georgia Commission on Equal Opportunity and the Equal Employment Opportunity Commission, Dean Lindberg placed Ms. Swanson on a Performance Remediation Plan, even though Ms. Swanson's most recent 360 review contained effusive praise -- and even though Ms. Swanson had not been warned or disciplined that her performance was in any way deficient. That's because it wasn't.

5.      This lawsuit to remediate violations of Title VII of the Civil Rights Act of 1964, the Georgia Fair Employment Practices Act, and the Georgia Whistleblower Act therefore follows to vindicate Ms. Swanson's rights and to deter Defendants from further unlawful conduct.

## PARTIES, JURISDICTION, AND VENUE

6.      Danielle Swanson, Assistant Professor and former Chair of the

English and Spanish at GHC, is a resident of Georgia and submits herself to this

Court's jurisdiction.

7.      Defendant Georgia Highlands College and the Board of Regents of

the University System of Georgia are public entities. Under O.C.G.A. 9-11-4(e)(5),

therefore, service of process upon Defendants may be accomplished by serving the

summons and a copy of this Complaint upon the Chancellor of the Board of

Regents and the Attorney General of Georgia.

8.      More specifically, Defendants may be served through Dr. Sonny

Perdue, Chancellor, or one of his designees in the legal department, at 270

Washington Street, SW, Atlanta, Georgia 30334.

9.      The Attorney General of Georgia, moreover, may be served through

Chris Carr or one of his designees at 40 Capitol Square, SW, Atlanta, Georgia

30334.

10.     Ms. Swanson's claims present federal questions over which

this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).
.

11.     This Court also has supplemental jurisdiction over Ms. Swanson's

state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same

nucleus of operative facts as her federal claims.

3

12.     Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3) and Local Rule 3.1(B)(3), venue is proper because the unlawful practices giving rise to Ms. Swanson's claims occurred in this judicial district and division.

## SATISFACTION OF ADMINISTRATIVE PREREQUISITES

13.     Ms. Swanson has satisfied all administrative prerequisites to perfect her federal claims under Title VII. Indeed, Ms. Swanson filed Charges 1) Danielle Swanson vs. BOR - Georgia Highlands College, GCEO # 25-0012-EC / EEOC # 11B-2025-00168 and 2) Danielle Swanson vs. BOR - Georgia Highlands College, GCEO # 25-0032-EC / EEOC # 11B-2025-00312 with the GCEO and the EEOC and received Right to Sue notices.

14.     This lawsuit has been filed within 90 days of the issuance of the Right to Sue notices.

## GHC HIRES PROFESSOR SWANSON BASED ON HER EXCELLENT TEACHING HISTORY

15.     Danielle Swanson taught in the Adult Education program and the English department at Chattahoochee Technical College from Fall 2010 through August 2021. In that role, Ms. Swanson received effusive praise from faculty, staff, and students.

16.     In or around August 2021, and due in no small part to Ms. Swanson's excellent reputation from her tenure at CTC, GHC hired Ms. Swanson as Full-time English Instructor in the School of Humanities.

4

17.    In this role, Ms. Swanson reported to Jessica Lindberg, Dean of the School of Humanities.

18.    Ms. Swanson quickly ingratiated herself into the GHC community. Indeed, Ms. Swanson not only developed and taught freshman composition courses, but also worked to improve diversity and equity by establishing activities for Native American Heritage Month. Ms. Swanson also developed community relationships by serving as part of the PrimeTime program team at the Bartow County Library; set up a Little Free Library with the support of the Bartow County Literacy Council; and assisted with the organization of the Georgia Highlands Writers Conference, including securing food donations, contacting authors and publishers for the panels, and hosting an author in a virtual workshop, as but a few examples.

19.    Ms. Swanson's first-year accomplishments are all the more impressive considering she started at GHC amid the ongoing fallout from the COVID-19 pandemic, which presented myriad challenges, including hybrid teaching, difficulty meeting individually in person, broad leadership changes, and restrictions on group gatherings.

## GHC PROMOTES MS. SWANSON TO DIVISION CHAIR OF THE HUMANITIES DEPARTMENT ON THE BACK OF HER EXCELLENT FIRST YEAR

20.     On the back of her excellent first year, and at the conclusion of a competitive application process involving both internal and external candidates, Ms. Swanson  was selected to serve as Division Chair of the English Department. This was a huge promotion and came with a significant increase in responsibilities, as well as a large pay raise.

21.     In this role, Ms. Swanson spearheaded the creation of innovative programming to improve enrollment and student success, including developing new courses and revising syllabi.

22.     Ms. Swanson also supported faculty development, including by leading faculty learning communities, establishing annual departmental retreats, and developing individual relationships.

23.     As if her plate wasn't already overflowing, Ms. Swanson also served as the director of the Highlands Writers Conference; continued and expanded her work with the Bartow County Library to include serving on the Friends of the Library Board, which established a partnership to host the annual craft fair at GHC; and collaborated with multiple departments within the college, including expanding Native American Heritage month programming with the school library and registering students during orientations with admissions.

24.     Just as critically, Ms. Swanson worked to help motivate faculty, inspiring them to develop goals more in line with the University System of Georgia's rank requirements; sent out weekly emails that allowed engagement between different campuses; and overall worked to increase morale and confidence in the department.

25.     Ms. Swanson further developed master course shells that would later serve as an example by the Center for Excellence and Learning of how to build a master course and began focused work with the other chairs to create a student focused schedule in response to the concerns of the Provost, the Dean, and the academic advisors.

26.     Suffice to say, Ms. Swanson's first year as Chair went about as well as it could, and this excellent performance was reflected in her annual review, where she received high marks and kudos from Dean Lindberg, particularly with respect to Ms. Swanson's promotion from instructor to Assistant Professor. As if the above accomplishments didn't make that clear, in light of Ms. Swanson's excellent performance, Dean Lindberg asked Ms. Swanson to also oversee the Spanish Department.

## MS. SWANSON KEEPS HER CHAIR ROLE BECAUSE OF HER EXCELLENT PERFORMANCE

27.    Ms. Swanson's second year as Chair picked up where her first left off.

28.    In her second year as chair, Ms. Swanson began to establish a presence for the GHC English department within regional and national organizations. In addition to supporting her faculty in their work to re-establish the Georgia chapter of the Two Year College English Association (TYCA), Ms. Swanson herself attended and presented at the Southern Atlantic Modern Language Association, obtained an active role on the board for the Society for the Study of Southern Literature, attended and presented at the University of Georgia Teaching and Learning Conference with her GHC colleagues, attended and presented at TYCA-Southeast, and had her own short stories published on a literary website.

29.    Along with this important work, Ms. Swanson also served as the Director and chief organizer of the Georgia Highland Writers Conference. As part of this prestigious conference, GHC invited published authors to share their approaches with aspiring and accomplished writers alike. Ms. Swanson secured a majority of the speakers, including the keynote, oversaw event publicity, and organized and ran the day of programming. The conference was the largest held at GHC, with more than 100 participants in attendance.

## DEAN LINDBERG DENIES MS. SWANSON'S LEAVE REQUEST FOR NO REASON WHATEVER

30.    In July 2023, Ms. Swanson underwent an elective medical procedure. Before her scheduled surgery, Ms. Swanson requested three weeks of leave from Dean Lindberg so she could undergo the procedure, then rest and convalesce in accordance with her care team's recommendations.

31.    Dean Lindberg outright denied Ms. Swanson's request for leave, against the advice of Ms. Swanson's care team, because she purportedly felt that Ms. Swanson would return to work early even if her request for time off was approved.

32.    Dean Lindberg wholly failed to advise Ms. Swanson of her rights under the Family and Medical Leave Act, and also failed to engage in any sort of interactive process.

33.    Because Dean Lindberg inappropriately denied Ms. Swanson's request for three weeks off – which, to be clear, was purposefully requested in the middle of summer during GHC's slow season – Ms. Swanson returned to work a week after a major surgery, a time when most people are not even walking fully upright from the procedure. On her first day back, Ms. Swanson worked a ten-hour day with a medical bag taped to her leg and hidden by wide legged pants. Ms. Swanson only left when one of the other college deans told her she should not be there and to go home.

9

34.     Even though Ms. Swanson came back to work against medical advice, she hit the ground running and continued her forward momentum from the prior year. Indeed, at the start of the Fall 2023 semester, Ms. Swanson was selected to Leadership Bartow, an invitation-only leadership accelerator organized by the Cartersville-Bartow Chamber of Commerce. Ms. Swanson also agreed to serve as director for the Writers Conference again, and continued with her duties as Division Chair.

35.     Then came the 2023 GHC gala, which the College threw to celebrate President Mike Hobbs.

## DEAN LINDBERG SUGGESTS THAT MS. SWANSON SHOULD HAVE SEX WITH GHC'S PRESIDENT TO BENEFIT THE HUMANITIES DEPARTMENT

36.     The 2023 GHC Gala took place on September 28, 2023, at GHC's Floyd Campus in Rome, Georgia.

37.     While the Gala attendees only received two tickets for wine, Dean Lindberg procured other tickets, and additional wine was brought in by another member of the School of Humanities. At some point in the evening, Ms. Swanson found herself in a conversation with Dean Lindberg and Dean Lindberg's husband. During that conversation, and totally unprompted, Dean Lindberg inferred that Ms. Swanson should have sex with President Hobbs to help out the School of Humanities.

38.    In other words, Dean Lindberg, the head of the School of Humanities and a member of GHC's administration, instructed Ms. Swanson, her subordinate, to sleep with President Hobbs so that Dean Lindberg's department could potentially get more money.

39.    Mr. Lindberg immediately turned to Dean Lindberg and told her that she was "cut off." Ms. Swanson understood Mr. Lindberg to be telling Dean Lindberg to stop drinking.

40.    While the suggestion clearly bothered her, Ms. Swanson chose not to report Dean Lindberg's statement at that time because she was uncertain of processes and afraid of retaliation. This fear proved prescient.

41.    The following academic year was just as busy and productive as the year before. On top of what she'd been doing, Ms. Swanson also worked directly with the Center for Excellence in Teaching and Learning to identify gaps in professional development, create programming and curriculum, and facilitate said programming.

42.    In addition to her duties as Division Chair, Ms. Swanson attended a chair institution with the Modern Language Association - the largest Humanities organization in the world- and began work to obtain grant funds and organize a professional development institute, including creating a partnership with Georgia State University. She continued work with the Bartow County Library.

11

43.     At the direct request of President Hobbs, Ms. Swanson also served as the co-advisor for runGHC, the school running club which was a part of the President's initiative to add more sports teams to the school's roster, and helped organize the first annual Dollars for Scholars 5k. While Dean Lindberg went along with this appointment because it was at the President's request, she made open comments of disgruntlement about the position and held the time spent on the club against Ms. Swanson. This further placed Ms. Swanson in turmoil between doing what was asked of her by supervisors.

44.     Despite Dean Lindberg's apparent frustration with Ms. Swanson's work with her students, Ms. Swanson again received rave reviews and high marks in her 2023-2024 performance evaluation based on her excellent work and significant contributions to her department and the College.

45.     In early Fall 2024, at the start of the academic year, Ms. Swanson was carrying a full course load and was also working to organize that year's GHC Writer's Conference, as she'd done the previous two years. On top of that work, Ms. Swanson was also working diligently to fulfill her myriad duties as Chair, which included developing and refining curriculum, scheduling courses, and assisting with faculty retention and improvement.

46.     With all this on her plate, Ms. Swanson began to experience symptoms of anxiety and depression. These afflictions, moreover, impacted Ms.

Swanson's ability to eat, sleep, teach, concentrate, and work. Because of these symptoms, Ms. Swanson sought professional help and began attending therapy with a psychiatrist.

47.    In conversation, Ms. Swanson disclosed the state of her mental health and confided to Dean Lindberg that her mental health was having a direct impact on her online course instruction. Ms. Swanson offered documentation from her therapist as needed to support her concerns and claims. Dean Lindberg responded that the documentation was not needed and that Ms. Swanson's real problem was time management and she should figure it out.

48.    No assistance or additional support was offered, even though Dean Lindberg could have and should have begun the interactive process under the Americans with Disabilities Act and provided Ms. Swanson with information regarding Family and Medical Leave Act leave.

49.    On information and belief, Dean Lindberg did ask President Hobbs to text Ms. Swanson. This belief is based on the fact that President Hobbs sent over a message to Ms. Swanson to let her know that she was a value to GHC and that he was appreciative of all that she was doing.

**MS. SWANSON RAISES CONCERNS ABOUT DEAN LINDBERG'S CONDUCT TO DR. LOCKETT-LEWIS, AVP AND DEAN OF STUDENT SUCCESS**

50.    As her symptoms of depression and anxiety continued to take hold, on or about October 9, 2024, Ms. Swanson reached out to Dr. Michelle Lockett-Lewis, her trusted colleague and Assistant Vice President of Student Success, Dean of Students, for advice because Ms. Swanson's professional relationship with Dean Lindberg had soured.

51.    Ms. Swanson asked if Dr. Lockett-Lewis was required to report information before she told her any further information. In her role as AVP for Student Success, Dr. Lockett-Lewis knew the practices of the college, so Ms. Swanson felt that she was an excellent resource to provide information about how to best handle the situation. Even so, Ms. Swanson remained uncertain about officially reporting Dean Lindberg's comments for fear of retaliation.

52.    In the course of their conversation, Ms. Swanson confided to Dr. Lockett-Lewis that Dean Lindberg had inferred she should have sex with President Hobbs at the 2023 Presidential Gala, had callously denied Ms. Swanson's request for three weeks of leave to recover from surgery, and had failed to respond when Ms. Swanson presented the issues her mental health was having on her work.

53.    As the conversation concluded, Dr. Lockett-Lewis, as a mandated reporter, explained to Ms. Swanson that she felt obligated to report Dean

14

Lindberg's comments to the GHC human resources team. Ms. Swanson responded that she would much prefer not to turn this into an issue because she remained fearful of retaliation. Dr. Lockett-Lewis responded that she had no choice but to report Ms. Swanson's concerns.

54.    Not long thereafter, in or around early November 2024, Dr. Lockett-Lewis met with Dana Itkow, Chief Human Resources Officer, to report Dean Lindberg's instruction to Ms. Swanson.

55.    Ms. Itkow, a seasoned HR executive with more than twenty years of experience, did not do anything that an HR executive in her position and with her experience would normally do. She did not interview Ms. Swanson, did not collect any evidence, and did not otherwise conduct any sort of investigation whatsoever, but rather solely requested a written narrative from Ms. Swanson.

56.    Instead, Ms. Itkow chose to convene a meeting between herself, Dean Lindberg, and Ms. Swanson. While it remains unclear what motivated Ms. Itkow to do this, the result was disastrous for Ms. Swanson.

57.    Sensing the high potential for malfeasance – which ultimately occurred here – and feeling uncomfortable in general with the situation, Ms. Swanson requested that Dr. Lockett-Lewis sit in on the meeting as an observer. Ms. Itkow agreed to this request.

## GHC'S CHRO FORCES MS. SWANSON TO DIRECTLY CONFRONT DEAN LINDBERG, WITH PREDICTABLE RESULTS

58.     The contemplated meeting between Ms. Swanson and Dean Lindberg, with Ms. Itkow as moderator and Dr. Lockett-Lewis as an "observer" took place on December 3, 2024. Ms. Itkow, Ms. Swanson, and Dean Lindberg attended in person, while Dr. Lockett-Lewis attended virtually.

59.     Ms. Itkow began the meeting by reading out the written narrative of Ms. Swanson's accusations against Dean Lindberg. This was highly uncomfortable with Dean Lindberg sitting right across from  Ms. Swanson. At some point during the reading, Ms. Swanson, unable to take the continued tension, interrupted Ms. Itkow to alleviate the significant discomfort.

60.     After Ms. Swanson concluded  her statement about how Dean Lindberg 1) instructed her to have sex with President Hobbs to benefit the School of Humanities ; and 2) unlawfully and inappropriately denied Ms. Swanson's request for leave without even mentioning the FMLA, as she was required by law to do, Ms. Itkow asked Dean Lindberg to respond to what she'd heard.

61.     Dean Lindberg tellingly did not deny any of Ms. Swanson's narrative. In fact, Dean Lindberg admitted that she denied Ms. Swanson's request for leave, which was not only against GHC policy, but patently unlawful. Rather than doing anything to rectify that situation or otherwise educate Dean Lindberg on her responsibilities under the law, Ms. Itkow at first blamed Ms. Swanson, stating that

16

she should have known about FMLA. When Ms. Swanson questioned if denying leave was the correct response for a supervisor, Ms. Itkow conceded it wasn't, and admonished Dean Lindberg not to do that again.

62.    As for her comment that Ms. Swanson should have sex with President Hobbs to help out the Humanities Department, Dean Lindberg said that she couldn't remember what had occurred, admitting that it could have happened. She refused outright to accept any responsibility for what she'd said and how it made Ms. Swanson feel. Rather, Dean Lindberg stated she could not control what was in Ms. Swanson's head or how Ms. Swanson responded to things.

63.    The meeting mercifully ended not long thereafter. No further investigation was performed, even though GHC's typical practice was to do so in conformance with its obligations under Title IX, and no documentation of the meeting was provided or signed by any of the parties involved.

64.    It seems that, instead, Ms. Itkow simply considered the matter closed.

65.    In all frankness, so did Ms. Swanson. She'd never wanted to bring her concerns forward in the first place. Because of that, Ms. Swanson resolved to simply do her job to the best of her ability and move forward.

66.    And that's what should've happened. Indeed, at the start of the Spring 2025 Semester, Ms. Swanson was gearing up for another successful semester

teaching classes, chairing her department, and organizing the GHC Writer's Conference for the third year running.

**MS. SWANSON RECEIVES AN EXEMPLARY 360 REVIEW**

67.     In addition, Ms. Swanson was working to organize and put on the Modern Language Association Summer Institute: Teaching Reading and Writing at an Access Oriented Institution. MLA is the largest humanities organization in the world; the fact that Ms. Swanson was spearheading the program is only further confirmation of her excellent performance.

68.     Ms. Swanson's 360 Review, delivered on January 6, 2025, echoes this feedback. For context, to create the 360 Review, GHC takes feedback regarding Ms. Swanson's job performance from her superiors, colleagues, and subordinates with respect to a slew of categories. Those responses and that data are then aggregated and the review is finalized and delivered to the recipient.

69.     Ms. Swanson's review is nothing short of extraordinary. Indeed, in nearly every category, Ms. Swanson received a rating of either "Excellent" or "Extraordinary."

70.     In the review, Ms. Swanson's reviewers also praised her effusively. A representative sampling of direct quotes therefrom includes the following:

a.     Danielle is very open to all my ideas and often looks for ways to contribute to my ideas or plans. Often, I feel very supported throughout my day with positive encouragement and a reminder that I am doing the best work I can. These comments help me feel better

18

about my job and the work I am putting into it. Additionally, she often asks for my feedback on different projects. She also looks for ways to support me in my position by simply being present on days when I may be on a different campus. I know my students see that benefit as well.

b.    Danielle is an outstanding communicator.

c.    Danielle is a very effective, very kind leader. I appreciate her energy and her enthusiasm, and I feel very supported by her.

d.    Danielle Swanson is a joy to work with (and to serve under). She is responsive, informed, and supportive. I give my highest praise for her commendable work.

e.    I know there is some departmental resistance to her ideas with AI specifically, but overall she makes her case convincingly and allows people to voice their opinions while still controlling the overall tone and narrative for the department. At times she meets the "but this isn't how we've done things" sentiment and always focuses on both the larger disciplinary issues as well as the future of our students specific to GHC.

f.    Danielle owns her processes well and expects the same from all of us in English and Spanish. She sets a great example that I, at least, want to follow, to the point that when I feel I am not living up to my own potential I feel the need to apologize for it and discuss it with her, at which point she balances compassion with strategic planning.

g.    I have been incredibly happy with Danielle's ability to get results in her role as chair. Perhaps most to this point, I am glad that she continues to evolve her vision for the English department so that we are always moving towards improvement while also getting a lot of positive feedback/encouragement for the work we are already doing.

h.    I believe she would be well suited for a department chair or higher position.

i.    Of all the leaders I've served under, Danielle Swanson is the most caring and invested. She wants to see students achieve and the faculty to experience professional growth. She is an excellent leader.

j. Professor Swanson is a driving force in the Humanities School. She generates new ideas and collaborates with her fellow chairs and faculty members. She is innovative and hardworking whether working with students in the Run Club or the classroom. Danielle has high expectations of herself, which is evident in what she accomplishes.

71. These comments, solicited from faculty, Ms. Swanson's supervisors, and her teammates, paint a picture of a Division Chair who really cares for her students, her colleagues, and the broader GHC mission. As one commentator put it, Ms. Swanson is, to put it simply, "an excellent leader."

## DEAN LINDBERG STRIPS MS. SWANSON OF HER DIVISION CHAIR ROLE AND CUTS HER PAY BY MORE THAN 30 PERCENT

72. So imagine Ms. Swanson's surprise and dismay when, on January 23, 2025, Ms. Swanson attended a meeting between herself, Ms. Itkow, Provost Sarah Coakley, and Dean Lindberg, during which Dean Lindberg stripped Ms. Swanson of her role as Division Chair.

73. No other Division Chair has ever been stripped of their role at GHC.

74. Also during that meeting, Dean Lindberg informed Ms. Swanson that her salary would be decreased from $74,880.00 per year down to $50,044.80, a more than 30% pay cut.

75. Ms. Swanson was caught off-guard by this demotion and significant pay cut, particularly in light of the effusive feedback she'd just received from the faculty she oversaw and her supervisors on all levels. Given the demotion was so dissonant with the contemporaneous feedback she'd just received, Ms. Swanson

20

asked some pointed questions regarding why she was being demoted out of

nowhere.

76.    In response, Dean Lindberg stumbled through some nonsense excuse

about how Ms. Swanson was too focused on leadership and faculty development,

and Dean Lindberg would have preferred that Ms. Swanson be more organized and

create better Excel documents.

77.    This flimsy and bizarre excuse came out of nowhere – indeed, Dean

Lindberg never warned or disciplined Ms. Swanson regarding purported

"organizing" issues.

78.    Dean Lindberg further confirmed during the meeting that no

documentation existed that might suggest that Ms. Swanson had been coached

regarding "organizing" issues.

79.    The meeting concluded after Dean Lindberg confirmed that Ms.

Swanson would receive further information relating to her demotion in short order.

80.    No such information was forthcoming – obviously because no such

documentation to support Ms. Swanson's demotion existed – so by email to Dean

Lindberg, Ms. Itkow, and Dr. Coakley dated January 28, 2025, Ms. Swanson asked

when she could expect GHC to send her information regarding the reason for her

demotion.

81.    Three days later, on January 31, 2025, Ms. Itkow responded that Ms. Swanson would receive more information "soon."

82.    Several days later, Dean Lindberg asked Ms. Swanson to create the fall faculty schedule, which was one of the Division Chair's responsibilities. Given Ms. Swanson had been demoted from that role, Dean Lindberg's instruction was confusing (and reflected that no one at GHC had put any thought into the consequences that might stem from Ms. Swanson's retaliatory demotion).

83.    Meanwhile, no information was forthcoming regarding the demotion decision, which is but further confirmation that GHC was still scrambling to cover its tracks. For that reason, by email to Ms. Itkow, Dean Lindberg, and Dr. Coakley dated February 7, 2025, Ms. Swanson relayed that Dean Lindberg was still asking her to perform her Chair duties, and asked again when information would be provided relating to the reasons underlying her demotion and clear details about the impending negative action.

84.    Later on February 7, 2025, Dean Lindberg finally responded to Ms. Swanson's repeated information requests. In a new email, Dean Lindberg painted Ms. Swanson's demotion as a "non-renewal" of her Chair position, and seemingly sought to placate Ms. Swanson by suggesting that GHC wanted to "support [Ms. Swanson's] leadership potential."

## MS. SWANSON FILES AN ETHICS COMPLAINT WITH USG

85.     During this same time, Ms. Swanson filed an ethics complaint with the University System of Georgia, in which she alleged Dean Lindberg retaliated against her when demoting her from the Chair position. USG, rather than contacting Ms. Swanson and investigating the ethics complaint – as is protocol – ignored her complaint entirely.

86.     On February 19, 2025, Ms. Swanson met with Dean Lindberg to discuss the transition from chair to faculty. During that meeting, which was recorded upon the consent of all parties, Dean Lindberg informed Ms. Swanson that the School of Humanities and School of Social Sciences would be merging. Dean Lindberg pressed Ms. Swanson to toe the line and parrot that her demotion was part of this departmental transition. According to Dean Lindberg, so long as Ms. Swanson rolled over and did as she was bid, GHC would continue to support her "leadership potential."

87.     This was all nonsense, of course: Ms. Swanson had literally just been demoted and had her pay cut by over a third because she'd raised concerns regarding Dean Lindberg's conduct.

88.     Before the meeting concluded, Ms. Swanson again requested that she be presented with documentation or information that would support the purported reasoning behind her demotion. Dean Lindberg became flustered; she first

confirmed again that no such documentation existed, then blurted out that she simply could not work with Ms. Swanson any longer.

89.    About two weeks later, Ms. Itkow requested a meeting with Ms. Swanson to complete HR paperwork regarding the demotion. Ms. Swanson, via email, stated that she was uncomfortable meeting with Ms. Itkow alone, requested the presence of a third party from the HR department, and required the meeting to be recorded. Ms. Itkow responded in email that she thought the meeting could just be between the two of them, seemingly taken aback that Ms. Swanson would expect that GHC follow its own policies and procedures.

90.    During the meeting, which took place on March 3, 2025 and included Ms. Swanson, Ms. Itkow, and Ms. Vicky Drnek, an HR Generalist at GHC, Ms. Itkow admitted that no additional investigation had been conducted into Ms. Swansons' allegations that Dean Lindberg made an extremely inappropriate comment towards her.

91.    To be sure, given Dean Lindberg's husband was standing next to her and overheard her comment, all Ms. Itkow had to do was call him up and ask what he'd heard. She didn't make that effort, for obvious reasons.

92.    Ms. Itkow further confirmed that, in contravention of GHC's obligations under federal law, no Title IX complaint had been initiated either.

24

93.    Ms. Swanson made it clear that she wanted her demotion to be separate from the announcement of the merger of the two schools and not to be seen as part of that transition.

94.    Later by email on the same day, March 3, 2025, to the Humanities faculty, Dean Lindberg announced that Allen Dutch would take over the supervision of the English and Spanish faculty the conclusion of the academic term.

## MS. SWANSON FILES THE FIRST CHARGE OF DISCRIMINATION WITH THE GCEO AND EEOC

95.    Because GHC had made it abundantly clear that Dean Lindberg's retaliatory demotion of Ms. Swanson would not be overturned and that no further investigation into Ms. Swanson's internal complaint or her USG ethics complaint would be conducted, on or about March 17, 2025, Ms. Swanson filed and executed a Charge of Discrimination with the Georgia Commission on Equal Opportunity ("GCEO") and the Equal Employment Opportunity Commission ("EEOC").

96.    In Charge No. GCEO # 25-0012-EC / EEOC # 11B-2025-000168, Ms. Swanson specifically alleged that GHC retaliated against her by stripping her of her role as Division Chair and cutting her pay by over one third because she reported Dean Lindberg's harassing comment towards her at the Presidential Gala.

97.    To ensure that GHC was fully aware of her protected complaints – particularly because Ms. Itkow confirmed that 1) no Title IX investigation had

25

been opened; and 2) no investigation into Dean Lindberg's misconduct had been

performed at all – by letter from her counsel dated March 18, 2025 to President

Hobbs, Ms. Swanson again complained that GHC retaliated against her by

demoting her and slashing her pay because she raised protected complaints.

98.    Unfortunately, Dean Lindberg's retaliatory efforts only amplified after

Ms. Swanson dual-filed her Charges of Discrimination and sent along her letter of

complaint to President Hobbs.

99.    As but a few examples, Dean Lindberg ignored Ms. Swanson in the

office, refused to respond to text messages or answer calls, and tasked Ms.

Swanson with make-work that no other chair had to do. Ms. Swanson, while

expected to continue her role as chair, was no longer included in Humanities

leadership meetings, which limited her knowledge and understanding of what was

occurring in the School.

100.    In addition, Dean Lindberg forced Ms. Swanson to complete her staff

and faculty evaluations as a working draft, then send them to Dean Lindberg for

commentary and review, before editing them and then sending them along with

Dean Lindberg's scoring be final. No other division chairs were required to

complete the process this way. Further confirming the retaliatory make-work

nature of this assignment, Mr. Dutch met with Dr. Lindberg to review his

evaluations, an option that Dean Lindberg offered to Ms. Swanson the day

evaluations were due and after Ms. Swanson had already written and revised the majority of the evaluations. The Chairs in the other schools, moreover, completed their evaluations independent of the deans, as the chairs were faculty supervisors. Ms. Swanson later understood that this was partially an act of favoritism towards faculty members when merit raises were provided to faculty members with certain ratings, which Dean Lindberg had insured the faculty members she favored had and which others, specifically newer faculty members, did not. This was a further act of retaliation, an attempt at hurting not only Ms. Swanson but those that were loyal to her.

101.    Meanwhile, more than two months after Ms. Swanson filed her ethics complaint with USG, on or about May 20, 2025, Steffanie Morrison, counsel for USG, reached out to speak to Ms. Swanson about her ethics complaint.

102.    After some back and forth, that meeting was scheduled for June 13, 2025.

## GHC LIES TO THE GCEO AND EEOC IN ITS SWORN WRITTEN TESTIMONY

103.    Before the ethics complaint interview with Ms. Morrison occurred, by email dated June 6, 2025, the GCEO served Ms. Swanson with summaries of GHC's sworn interrogatory responses. Those responses contain misleading information, as well as outright falsehoods that were verified by Ms. Itkow.

104. For instance, despite literally announcing in writing in an email to staff, as well as on GHC's webpage that Mr. Dutch had replaced Ms. Swanson as Division Chair of the Humanities Department, GHC stated in its sworn interrogatory responses that no such promotion had been made. This was an outright lie.

105. GHC further sought to create the impression that Division Chair roles were doled out year-to-year. The reality is that in GHC's history, no other Division Chair besides Ms. Swanson has ever been demoted in the middle of the academic year. In fact, more damning still, no other Division Chair besides Ms. Swanson has ever been stripped of their role, including through denial of contract renewal, period.

106. On or about June 13, 2025, Ms. Morrison interviewed Ms. Swanson as part of USG's investigation into Ms. Swanson's ethics complaint (even though barely a week prior, Ms. Itkow had provided written testimony to the GCEO that no such complaint was ever raised).

107. During that interview, Ms. Swanson explained to Ms. Morrison that she'd confided to Dr. Lockett-Lewis that Dean Lindberg had pressured her to have sex with President Hobbs. Ms. Swanson further explained that Dr. Lockett-Lewis, in turn, had reported Dean Lindberg's comment to Ms. Itkow, and that after the

December 3, 2024 meeting where Ms. Itkow forced Ms. Swanson to confront Dean

Lindberg about the comment, Dean Lindberg turned around and demoted her.

108.   Ms. Swanson further explained to Ms. Morrison that Dean Lindberg

continued to retaliate against her by freezing her out of meetings, forcing her to do

busy work, and commenting to Ms. Swanson that she could no longer work with

her. Ms. Swanson thereafter provided audio recordings of the conversation where

Dean Lindberg stated she could no longer work with Ms. Swanson.

## GHC PLACES MS. SWANSON ON A RETALIATORY PRP AND MS. SWANSON FILES A SECOND CHARGE OF DISCRIMINATION WITH THE GCEO AND EEOC

109.   Barely three days after participating in the investigatory meeting with

Ms. Morrison, on June 16, 2025, Dean Lindberg placed Ms. Swanson on a

Performance Remediation Plan ("PRP") based on purported performance issues.

110.   In reality, Dean Lindberg placed Ms. Swanson on the PRP in

retaliation for raising protected concerns, filing the GCEO and EEOC charges, and

participating in USG's ethics investigation.

111.   About three weeks later, during a July 7, 2025 meeting between Dean

Lindberg and Ms. Swanson (which was recorded and transcribed), Ms. Swanson

asked if the PRP was based on her administrative position, which she had been

removed from, or her teaching work. Dean Lindberg sought to explain that Ms.

Swanson had been placed on the PRP based on her teaching performance.

112.    This made no sense and demonstrates the PRP's pretextual nature, as Dean Lindberg had previously told Ms. Swanson during the January 23, 2025 demotion meeting that Ms. Swanson excelled in teaching.

113.    In response to that assertion, Dean Lindberg protested that Ms. Swanson had "ghosted" one of her fall 2024 courses, which was not correct. In truth, in fall 2024, after Ms. Swanson had confided to Dr. Lockett-Lewis that Dean Lindberg had encouraged her to have sex with President Hobbs, Ms. Swanson experienced a decline in her mental health. Ms. Swanson, crucially, came to Dean Lindberg with that information: in other words, Ms. Swanson told Dean Lindberg that she was experiencing a mental health crisis and asked for help. Yet rather than referring Ms. Swanson to the HR team to discuss next steps or suggest she take FMLA, Dean Lindberg did nothing. Instead, Dean Lindberg effectively told Ms. Swanson at the time to suck it up.

114.    Dean Lindberg became flustered, then flailed that Ms. Swanson's student DFW (those students who receive a D, an F, or a W- or in other words, do not pass the class) were higher than other faculty members as far back as 2021, two years before she was appointed Division Chair. But this is nonsense: the DFW rates are highly circumstantial and dependent on a variety of factors, including how late the students register for the course, if the course is a day or night course, and if the students are traditional, non-traditional, or dual enrollment students. Since Ms.

Swanson tended to take late added courses, evening courses, and courses that had been dropped mid-semester by adjuncts or for faculty illnesses, her DFW rates were by consequence higher.

115.   Ms. Swanson again asked for documentation of any notice she was given prior to the PRP, including verbal warnings, which, per Dean Lindberg's own statement, needed to be documented in an email. Of course, Dean Lindberg did not have these documents on hand during the meeting. In any event, the fact that Dean Lindberg had to tangentially point to junk data that was never used in evaluations to justify the PRP proves that it was nothing but a sham.

116.   After this ludicrous colloquy, Ms. Swanson asked another important question: why would Dean Lindberg allow Ms. Swanson to continue her role in charge of the MLA Conference – one that could have a larger impact on the reputation of the college – if Dean Lindberg had doubts about Ms. Swanson's abilities? As with Ms. Swanson's other questions, Dean Lindberg was unable to provide a satisfactory (or even cogent) answer.

117.   Before the meeting concluded, Ms. Swanson asked Dean Lindberg whether any other faculty member was placed on a PRP without at first being provided with documented warnings. Dean Lindberg did not answer her question, which effectively confirmed that the answer was obviously "no."

118. No other English faculty members were placed on a PRP during the 2024-2025 academic school year.

119. Given Dean Lindberg and GHC obviously placed Ms. Swanson on the unfounded PRP in retaliation for her prior GCEO, EEOC, and USG ethics complaints, Ms. Swanson had no choice but to file an additional Charge with the GCEO and EEOC alleging additional retaliation for engaging in protected activity.

120. That Charge was styled Georgia Commission on Equal Opportunity (GCEO) Case No. 25-0032-EC and U.S. Equal Employment Opportunity Commission (EEOC) Case No. 11B-2025-00312.

121. After filing that Charge, on or about August 6, 2025, Ms. Swanson asked whether she might be able to teach her fall courses remotely to avoid further harassment from Dean Lindberg and to minimize the impact of the depression and anxiety she'd developed from GHC's ongoing retaliation. Given many other faculty teach remotely – and because GHC purportedly desired Ms. Swanson to focus on teaching fundamentals under the PRP's terms – Ms. Swanson's request to teach remotely made sense and could easily have been granted.

**MS. SWANSON REQUESTS AN ACCOMMODATION AND IS OFFERED MEDICAL LEAVE INSTEAD**

122. Ms. Swanson was told the accommodation request could not be completed in time for the upcoming fall semester, which was about a week away, despite the fact that in Spring 2021, Ms. Swanson's own course load had been

changed after the first day of classes due to the same accommodation request by a fellow faculty member.

123.   Unable to continue working in the current environment, Ms. Swanson requested 12 weeks of leave under the Family and Medical Leave Act to treat her GHC-induced depression and anxiety. GHC, to its credit, granted Ms. Swanson's FMLA request.

124.   Ms. Swanson remains on leave as of the filing of this Complaint.

## COUNT I

## SEX-BASED RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

125.   Ms. Swanson incorporates Paragraphs 1-124 above as if fully set out herein.

126.   Ms. Swanson is an employee of GHC and the Board of Regents and is covered by the protections of Title VII.

127.   GHC and the Board of Regents are Ms. Swanson's employer and are subject to Title VII's requirements, including the statute's prohibition against retaliation.

128.   Ms. Swanson engaged in repeated acts of protected activity under Title VII, including when she reported Dean Lindberg's comments to Dr. Lockett-Lewis, as well as when she met with Ms. Itkow and Dean Lindberg, reported her

concerns to the USG ethics line, and filed Charges of Discrimination with the GCEO and EEOC.

129.   GHC, in response to this ongoing protected conduct, retaliated against Ms. Swanson by, among other things, 1) demoting her and slashing her pay; and 2) placing her on a sham PRP

130.   It further appears that these actions have been taken deliberately to force Ms. Swanson to resign.

131.   The conduct set out in the Complaint and in this Count I constitutes unlawful retaliation, in violation of Title VII.

132.   As a direct and proximate result of GHC's unlawful actions, Ms. Swanson has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

133.   GHC's actions were willful, wanton, and intentionally directed to harm Ms. Swanson.

134.   GHC's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

135.   Ms. Swanson is entitled to an award of back pay and benefits, front pay, injunctive relief, compensatory damages, punitive damages, attorney's fees,

and all other appropriate damages, remedies, and other relief available under Title VII.

## COUNT II

### RETALIATION, IN VIOLATION OF THE GEORGIA FAIR EMPLOYMENT PRACTICES ACT OCGA 45-19-29 *et seq*.

136.   Ms. Swanson incorporates Paragraphs 1-124 above as if fully set out herein.

137.   Ms. Swanson is an employee of GHC and the Board of Regents and is covered by the protections of the GFEPA.

138.   GHC and the Board of Regents are Ms. Swanson's employer and are subject to GFEPA's requirements, including the statute's prohibition against retaliation.

139.   Ms. Swanson engaged in statutorily protected activity under the GFEPA, including when she reported Dean Lindberg's comments to Dr. Lockett-Lewis, as well as when she met with Ms. Itkow and Dean Lindberg, reported her concerns to the USG ethics line, and filed Charges of Discrimination with the GCEO and EEOC.

140.   GHC retaliated against Ms. Swanson by, among other things, 1) demoting her and slashing her pay; and 2) placing her on a sham PRP.

141.   GHC, moreover, appears to have taken these and other actions to force Ms. Swanson to resign.

142.   The above-pleaded conduct toward Ms. Swanson constitutes unlawful retaliation, in violation of the Georgia FEPA.

143.   As a direct and proximate result of GHC's unlawful actions, Ms. Swanson has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

144.   GHC's actions were willful, wanton, and intentionally directed to harm Ms. Swanson.

145.   GHC's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

146.   Ms. Swanson is entitled to an award of back pay and benefits, and other relief available under the Georgia FEPA.

## COUNT III

## WHISTLEBLOWER RETALIATION, IN VIOLATION OF THE GEORGIA WHISTLEBLOWER ACT OCGA 45-1-4 *et seq*.

147.   Ms. Swanson incorporates Paragraphs 1-124 above as if fully set out herein.

148.   Ms. Swanson is an employee covered by the protections of the Georgia Whistleblower Act.

149.   GHC and the Board of Regents are employers subject to the requirements of the Georgia Whistleblower Act because they are public employers and receive state funds.

150.   Ms. Swanson engaged in statutorily protected activity under the Georgia Whistleblower Act, including when she reported Dean Lindberg's comments to Dr. Lockett-Lewis, as well as when she met with Ms. Itkow and Dean Lindberg, reported her concerns to the USG ethics line, and filed Charges of Discrimination with the GCEO and EEOC.

151.   GHC retaliated against Ms. Swanson by, among other things, 1) demoting her and slashing her pay; and 2) placing her on a sham PRP.

152.   The above-pleaded conduct toward Ms. Swanson constitutes unlawful retaliation, in violation of the Georgia Whistleblower Act.

153.   As a direct and proximate result of GHC's unlawful actions, Ms. Swanson has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

154.   GHC's actions were willful, wanton, and intentionally directed to harm Ms. Swanson.

155.   GHC's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

156.    Ms. Swanson is entitled to an award of back pay and benefits, front pay, injunctive relief, compensatory damages, punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under the Georgia Whistleblower Act.

## COUNT IV

## INTERFERENCE, IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

157.    Ms. Swanson incorporates Paragraphs 1-124 above as if fully set out herein.

158.    Ms. Swanson exercised her rights under the FMLA when discussing her symptoms of anxiety and depression with Dean Lindberg.

159.    Dean Lindberg, in response, failed to provide Ms. Swanson with any information at all relating to her rights under the FMLA.

160.    Based on this lack of information, Ms. Swanson at the time did not take any leave at all.

161.    Rather, Ms. Swanson continued to work because she was wholly unaware of her legal rights under the FMLA.

162.    As a result, Ms. Swanson is entitled to both equitable and monetary relief for the Defendant's violation of the FMLA, including without limitation back pay, front pay, attorney's fees, and costs of litigation.

163.  Ms. Swanson is also entitled to liquidated damages for Defendant's violation of her rights under the FMLA because Defendant's actions were willful violations of the FMLA.

**WHEREFORE,** Ms. Swanson demands a TRIAL BY JURY and the following relief:

a.  declare that Defendant has violated Plaintiff's rights under the federal and state statutes listed above;

b.  permanently enjoin Defendant from violating, in the future, Plaintiff's rights under the federal and state statutes listed above;

c.  award Plaintiff full backpay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

d.  award Plaintiff prejudgment interest as required by law;

e.  award Plaintiff compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

f.  award Plaintiff front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

g.  award Plaintiff punitive damages against Defendant sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future, as determined by the enlightened conscience of a jury;

i.  award Plaintiff reasonable attorneys' fees and expenses; and

j.  grant such additional relief as may be just and proper.

Respectfully submitted, this 19th day of December, 2025.

/s/ Cary R. Burke
Cary Burke
Georgia Bar No. 757627
LEE MEIER LAW FIRM
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 474-7628
cburke@leemeier.law

**COUNSEL FOR PLAINTIFF**